**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DESTINATION MATERNITY CORPORATION, | ) | CASE NO. 2:12-cv-05680-AB |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | HON. ANITA B. BRODY |
| *v.* | ) | |
| | ) | |
| TARGET CORPORATION, CHEROKEE INC., *and* ELIZABETH LANGE LLC, | ) | **JURY DEMAND** |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

**TARGET CORPORATION'S MEMORANDUM IN SUPPORT OF ITS MOTION
TO STAY PENDING *INTER PARTES* REVIEW PROCEEDINGS
BEFORE THE U.S. PATENT AND TRADEMARK OFFICE**

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION.................................................................................. 1

II.   BACKGROUND AND STATEMENT OF FACTS.................................... 2

   A.   The PTO, the America Invents Act, and *Inter Partes* Review Proceedings.......... 5

   B.   The Patents-in-Suit ........................................................................... 7

   C.   The Prior Art Submitted with Target's IPR Petitions ........................................ 11

      1.   J.C. Penney's Fall/Winter 2005 Maternity Catalog          11

      2.   U.S. Patent Application Publication No. 2004/0049834 ("Stangle")          13

      3.   U.S. Patent No. 6,276,175 to Browder ("Browder")          15

   D.   DMC Has Numerous Competitors in the Market................................... 16

      1.   DMC Has Threatened Several of Its Competitors in the Past          16

      2.   Other than Target, DMC Has Never Actually Sued Any of Its Many Other Competitors in the Market for Full Panel Maternity Pants          17

III.  ARGUMENT ................................................................................... 18

   A.   Law Governing Stays Pending the Outcome of PTO Proceedings ..................... 19

   B.   All Factors and the Totality of the Circumstances Favor Granting a Stay.......... 20

      1.   Granting a Stay Will Not Cause Undue Prejudice or Create a Clear Tactical Disadvantage for DMC          21

      2.   Granting a Stay Will Simplify the Issues and the Case for Trial          25

      3.   Discovery Is Incomplete and No Trial Date Has Been Set          27

      4.   The Totality of the Circumstances Favors Granting a Stay          28

IV.   CONCLUSION ............................................................................... 29

V.    REQUEST FOR HEARING AND/OR ORAL ARGUMENT ...................... 30

# I.  <u>INTRODUCTION</u>

This case involves two invalid patents.  Accordingly, shortly before filing its Motion to Stay,[1] Defendant Target Corporation ("Target") filed, for both patents, petitions for *Inter Partes* Review ("IPR") with the U.S. Patent and Trademark Office ("PTO").  Congress and the PTO created the IPR process to address and decide patent validity in an efficient manner.  Target's IPR petitions ask the PTO to confirm that the asserted claims of the Patents-in-Suit are invalid.  The petitions lay out, in explicit detail, numerous bases for which the asserted claims are invalid as anticipated, obvious, or both, in view of the prior art.  Target filed its IPR petitions because the PTO, with its unique expertise in assessing patent validity, is the best venue for conclusively establishing the patents' invalidity while avoiding further burdening this Court and the resources necessary for it to preside over a patent litigation that simply should not go forward.

Due to the strength of the invalidating prior art, the PTO likely will grant Target's IPR petitions and invalidate the asserted claims of the Patents-in-Suit.  If so, Plaintiff Destination Maternity Corporation's ("DMC") infringement claims will be entirely resolved and its cause of action extinguished.  Staying the case will conserve both judicial and party resources that otherwise will be unnecessarily expended during the parallel IPR proceedings.  Imposing a stay now is appropriate because this case is still in its early stages:  limited fact and third-party discovery has been conducted; there have been no depositions or expert discovery; no dispositive motions or *Markman* briefs have been filed; and a trial date has not yet been set.  Moreover, given the foregoing, the Court likely has not yet expended significant resources on this case.

---

[1]   Target's co-defendants, Cherokee Inc. and Elizabeth Lange LLC, do not object to the present Motion and agree and consent to the relief requested herein.

DMC will not suffer undue prejudice as a result of the requested stay.  DMC itself delayed filing suit for nearly *two years* after the first of its patents issued, Cairns Decl.[2] Ex. 1 and well over *three years* after first threatening Target with its prospective patent rights, *id.* Ex. 5. Despite lobbing prior, similar threats at other competitors besides Target, including at least J.C. Penney and Gap, *id.* Ex. 6, Ex. 7, DMC has never sued them on the Patents-in-Suit.  Even when DMC finally sued Target, DMC did not seek preliminary injunctive relief.  DMC, therefore, cannot credibly argue that it will be unduly prejudiced—or irreparably harmed—by the continued sale of the accused products during the requested stay or the course of this litigation. Indeed, staying the litigation now will not create undue prejudice where DMC's inaction indicates that DMC, itself, saw little or none when it initiated this case.

Staying this case now will conserve judicial and party resources and will not unduly prejudice DMC.  Accordingly, Target respectfully requests that the Court stay this case pending the conclusion of the IPR proceedings.

## II.   BACKGROUND AND STATEMENT OF FACTS

DMC alleges that Target and two co-defendants, Cherokee Inc. and Elizabeth Lange LLC, (collectively, "Defendants"), infringe two DMC patents (the "Patents-in-Suit"[3]) related to maternity garment bottoms (e.g., pants, jeans, shorts, or skirts) having a flexible, expandable panel that covers the abdomen of a pregnant woman.  *See* Compl. ¶¶ 12-39, ECF No. 1.  These

---

[2]    The Declaration of Debbie Cairns in Support of Target's Motion to Stay Pending *Inter Partes* Review is filed contemporaneously herewith.

[3]    The two Patents-in-Suit are (1) U.S. Patent No. RE43,531, entitled "Belly Covering Garment" (the "'531 Patent"), Cairns Decl. Ex. 2, and (2) U.S. Patent No. RE43,563, also entitled "Belly Covering Garment (the "'563 Patent"), *id.* Ex. 4.  The '531 Patent is a reissue of U.S. Patent No. 7,814,575, which was filed on May 31, 2007 and issued on October 19, 2010 (the "'575 Patent").  *Id.* Ex. 1.  The '563 Patent is a reissue of U.S. Patent No. 7,900,276 which was filed on May 8, 2008 and issued on March 8, 2011 (the "'276 Patent").  *Id.* Ex. 3. DMC surrendered the underlying '276 and '575 Patents upon issuance of the Patents-in-Suit.  *See* 35 U.S.C. § 252.  Moreover, the Patents-in-Suit are related:  The original application that resulted in the '563 Patent is a continuation of the original application that resulted in the '531 Patent; as such, the Patents-in-Suit are identical, except for their claims.  For that reason, a citation to any part of the '531 Patent, other than its claims, can and should be considered a citation to the '563 Patent, and vice versa.

garments are often referred to generically as, simply, "maternity pants" or "maternity jeans." DMC alleges that a certain style of maternity pants and jeans sold by Target, known as "full panel" maternity pants or jeans, infringes various asserted claims of the Patents-in-Suit.  *Id.* ¶¶ 24-26.  The flexible panel in "full panel" garments wraps all the way—or fully—around the wearer's waist and torso.

DMC also sells maternity clothing, including its Secret Fit Belly® line of full panel maternity pants and jeans.  The image below, from DMC's website, depicts one of DMC's Secret Fit Belly® products, which DMC claims are covered by the Patents-in-Suit, Cairns Decl. Ex. 8, Ex. 29, at 4-5:



*Id.* Ex. 9.

dms.us.52696077.01

In response to DMC's allegations, Target not only denied infringing the Patents-in-Suit, but also asserted that the patents are simply invalid.  *See* Answer ¶¶ 69–72, ECF No. 17.  Indeed, as the prior art makes clear, full panel maternity jeans, pants, and similar clothing had been known, made, used, and sold for many years before DMC first applied for its patent rights in May 2007.  As Target has set forth in its IPR petitions, this prior art invalidates the asserted claims of the Patents-in-Suit due to anticipation under 35 U.S.C. § 102, obviousness under 35 U.S.C. § 103, or, in many cases, both.  Cairns Decl. Exs. 10-13.

Under § 102, a patent claim is invalid as anticipated if each element of the claimed subject matter was described in a patent or printed publication, in public use, or on sale in the United States more than one year prior to the date on which the underlying patent application was filed with the PTO.  *See* 35 U.S.C. § 102(b).  The "one year prior" date under § 102 is often referred to as a patent's "bar date"—qualifying prior art dated earlier "bars" the patent claim at issue and renders it invalid.  Here, the common application underlying the Patents-in-Suit was filed on May 31, 2007, so the patents' bar date is May 31, 2006.

Several items of prior art, discussed in more detail below, are especially significant to the invalidity of the Patents-in-Suit.  All of this prior art is dated well before the patents' bar date: (1) A J.C. Penney catalog from Fall/Winter 2005 describing and showing maternity jeans that are virtually identical to the DMC Secret Fit Belly® jeans shown above, Cairns Decl. Ex. 14; (2) A patent application filed in September 2002 by Gregory Stangle and Elizabeth Rodriguez that describes and shows a flexible, seamless, tubular sleeve attached to pants or other bottoms to "provide support for the abdomen of the pregnant or overweight wearer or other wearer whose body proportions have changed," *id.* Ex. 15; and (3) A patent that issued in August 2001 to George Browder that describes and shows "a unitary, seamless knit, tubular garment" that both

"extend[s] over the abdomen and ends below the wearer's breasts" and can be attached to various garment bottoms for maternity and other purposes, *id.* Ex. 16.

In view of the prior art, there can be little question that the Patents-in-Suit are invalid.  At the very least, the validity of the Patents-in-Suit is highly suspect and uncertain.  Accordingly, until the validity issue is resolved, it does not make sense for the parties to continue to expend their own and this Court's resources litigating this case and engaging in further discovery.

A.    <u>The PTO, the America Invents Act, and *Inter Partes* Review Proceedings</u>

"[T]he PTO has acknowledged expertise in evaluating prior art and assessing patent validity."  *Old Reliable Wholesale, Inc. v. Cornell Corp.*, 635 F.3d 539, 548 (Fed. Cir. 2011).  Thus, the PTO's newly created IPR procedure is designed precisely to address and decide issues of patent validity in an efficient manner.  *See* Changes to Implement Inter Partes Review Proceedings, Post-Grant Review Proceedings, and Transitional Program for Covered Business Method Patents, 77 Fed. Reg. 48,679, at 48,679 (Aug. 14, 2012) (codified at 37 C.F.R. §§ 42.100 *et seq.*) (pertinent pages attached hereto as Cairns Decl. Ex. 17).  Thus, staying this case while the PTO addresses Target's IPR petitions would be the most efficient way to proceed.

The Leahy-Smith America Invents Act ("AIA") was enacted, in part, to improve upon the former *inter partes* reexamination proceedings by creating the new IPR proceedings.  *See* 35 U.S.C. §§ 311-319.  The purpose of the AIA and its new IPR process is to "establish a more efficient and streamlined patent system that will improve patent quality and limit unnecessary and counterproductive litigation costs."  77 Fed. Reg. at 48,680.  The IPR process is meant "to create a timely, cost-effective alternative to litigation."  *Id.*  Indeed, the IPR process is designed to reduce to one year the time the PTO spends reviewing validity, *see* 35 U.S.C. § 316(a)(11); 37 C.F.R. § 42.100(c), from the previous *inter partes* reexamination average pendency of 36.2

months, 77 Fed. Reg. at 48,725, and minimize duplicative efforts and costs by increasing

coordination between district court litigation and IPR proceedings, *id.* at 48,721.

      The IPR statute limits the use of IPR proceedings as a tool for tactical delay during

litigation by requiring that a petitioner seek IPR within one year after being served with a patent

holder's complaint.  *See* 35 U.S.C. § 315(b).  This one-year limit sets a ceiling on the PTO's

ability to commence IPR proceedings where there is pre-existing, ongoing litigation.  DMC

served its complaint on Target on October 4, 2012.  *See* Proof of Serv., ECF No. 5.  Target filed

its IPR petitions on August 27, 2013, well within the one-year limit.  Cairns Decl. Ex. 18.

      After a petitioner files an IPR petition, the patent owner has three months to file a

preliminary response in opposition.  35 U.S.C. § 313; 37 C.F.R. § 42.107(b).  Within three

months of the patent owner's opposition deadline, the PTO will grant the IPR petition if "there is

a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims

challenged in the petition."  35 U.S.C. § 314(a).  If the PTO grants review, a final determination

must be issued "not later than 1 year" after the petition is granted.  *Id.* § 316(a)(11).  The one-

year decision-making period may be extended for good cause by not more than six months, *id.*;

37 C.F.R. § 42.100(c), although "[e]xtensions of the one-year period are anticipated to be rare,"

77 Fed. Reg. at 48,695.

      Under the statutory timeframe, IPR proceedings will normally last approximately 18

months from the filing of a petition to the PTO's final decision.  Thus, if the PTO grants Target's

IPR petitions—which is statistically likely given that the PTO has instituted IPR proceedings in

126 out of 145 (87%) petitions that have been filed as of August 27, 2013, Cairns Decl. ¶ 22 &

Ex. 19—the PTO's initial decision will be expected around February 2014, with a final decision

around February 2015.

**B.**     **The Patents-in-Suit**

The Patents-in-Suit disclose and claim a maternity "garment worn during different stages of pregnancy and different stages of postpartum body changes."  Cairns Decl. Ex. 2, abstract. The "upper portion" of the garment includes "a belly panel that is expansible to cover and fit over [the] growing abdomen" of a pregnant woman.  *Id.*  The belly panel is connected to a "lower portion" of the garment, which can be, "for example, a pair of trousers, such as, [sic] denim jeans" or "a skirt."  *Id.* col. 2:31-34.  Although the patents' single independent claims, respectively, are worded slightly differently, both Patents-in-Suit disclose and claim essentially the same item:  an "expansible belly panel" whose upper edge—or "second torso encircling circumference"—is located "just beneath the wearer's breast area" and whose lower edge—or "first torso encircling circumference"—recedes downward to make way for the expansion of the belly panel and is attached to a "garment."  *Id.* cl. 1; *id.* Ex. 4, cl. 1.



FIG. 1                                                    FIG. 2

-7-

Figures 1 and 2 from the Patents-in-Suit, above, show the claimed "garment upper portion" (102), with its "belly panel" (124) (highlighted with red circles, above) and "second torso encircling circumference" (134), as well as the "garment lower portion" (104), with its "first torso encircling circumference" (126).  *Id.* Ex. 2, figs. 1, 2 & cols. 2:26-4:2.

During prosecution of the original applications underlying the Patents-in-Suit, *all* of the PTO's prior-art based rejections had in common one prior art reference in particular:  U.S. Patent No. 4,506,390 ("Stern"), which issued in 1985.  *Id.* Ex. 20, at 708-16, 732-43, Ex. 21, at 900-08, 941-50.  Based on the PTO's use of Stern in *all* of its 20 combined rejections under §§ 102 and 103, Stern was the best piece of prior art that the PTO relied on to reject claims during prosecution.[4]  Stern discloses a "maternity garment" having an "expandable waistband portion . . . which completely encircles the garment" connected to a lower "body portion."  *Id.* Ex. 24, abstract.  The expandable waistband portion "swoops down at the front portion of the garment to form a pouch which supports the lower portion of a woman's stomach."  *Id.*

Stern's Figures 1 and 2 (a side view), below, show Stern's "waistband portion" (11) and "body portion" (13).  *Id.* figs. 1, 2, col. 3:23-30.  A "curved downwardly expanding pouch" (19) "cups the lower portion of a woman's stomach and contours itself to fit it, and acts as a sling-like support which provides added comfort to a wearer."  *Id.* col. 4:18-44.

---

[4]     During prosecution of the original application underlying the '531 Patent, the PTO relied on Stern in its sole rejection of various claims for anticipation under § 102 and further relied on Stern alone or in combination with other prior art references in each of its nine distinct rejections of various claims for obviousness under § 103.  Cairns Decl. Ex. 20, at 708-16, 732-43.  Similarly, during prosecution of the original application underlying the '563 Patent, the PTO relied on Stern in both of its two rejections of various claims for anticipation under § 102 and further relied on Stern in combination with other prior art references in each of its eight distinct rejections of various claims for obviousness under § 103.  *Id.* Ex. 21, at 900-908, 941-50.



FIG. 1

FIG. 2

    In order to obtain the sole independent claim of the '575 Patent, which became the sole independent claim of the related '531 Patent asserted here,[5] DMC told the PTO that Stern's "waistband portion 11 does not encompass [DMC's] claimed invention," because Stern did not disclose "a garment upper portion having a second torso encircling circumference along the upper end of the belly panel above a location of maximum girth of the abdomen to hold the garment up and in place over the torso." *Id.* Ex. 20, at 644-46.  In other words, according to DMC, its "claimed invention" was different from Stern because the upper edge of Stern's full panel (element 11, above) did not extend high enough—above the "maximum girth of the abdomen"—on the wearer's pregnant belly.  *See id.*  Indeed, the PTO found that the location of the belly panel's upper edge "is what defines and differentiates applicant's invention from the prior art."  *Id.* at 190.  Therefore, in order to overcome the PTO's rejections in view of Stern, and

---

[5]     *See supra* note 3 and accompanying text.

dms.us.52696077.01

under 35 U.S.C. § 112, ¶ 2,[6] DMC stated that the "upper edge of [its] belly panel . . . encircles a wearer's torso just beneath the wearer's breast area."  *Id.* at 758, 771-72.

Similarly, to obtain the sole independent claim of the '276 Patent, which became the sole independent claim of the related '563 Patent asserted here,[7] DMC told the PTO that Stern's "expandable waistband portion" supported only a "lower portion of a woman's stomach" and, unlike DMC's claimed belly panel, was not "adapted to substantially cover a wearer's entire belly region."  *Id.* Ex. 21, at 923-25 (emphases omitted).  The PTO disagreed, finding that the claimed "entire belly region" was not "clearly defined" and that DMC had not claimed that its panel covered "an entire pregnant belly from an area just under the breast, over an entire pregnant belly and that extends under the entire belly to support the belly."  *Id.* at 947-48. Therefore, in order to overcome the PTO's rejections in view of Stern, DMC defined the claimed "belly region" by giving it boundaries, including a height "beginning just beneath the wearer's breast area and extending over the wearer's abdomen to a lower abdomen region beneath the wearer's belly."  *Id.* at 956-57, 963.

Thus, to overcome the PTO's repeated rejections in view of Stern and obtain issuance of the only two independent claims at issue in this litigation, DMC amended both claims to specify a panel height that exceeded the height of the panel disclosed in Stern.  The prior art Target submitted with its IPR petitions discloses this "missing" element of Stern, the absence of which led to the PTO's issuance of the Patents-in-Suit.

---

[6]   At the time of the rejection in question (June 2010), § 112, ¶ 2, required that all patent claims "particularly point[] out and distinctly claim[] the subject matter which the applicant regards as his invention."  35 U.S.C. § 112, ¶ 2 (2010).  Section 112, ¶ 2, is now § 112(b).  Section 112(b) replaces "applicant regards as his invention" with "inventor or a joint inventor regards as the invention" but is otherwise identical to former § 112, ¶ 2.  *See* 35 U.S.C. § 112(b) (2013).

[7]   *See supra* note 3 and accompanying text.

dms.us.52696077.01

C.      **The Prior Art Submitted with Target's IPR Petitions**

        The prior art submitted with Target's IPR petitions shows that the asserted claims of the

Patents-in-Suit are invalid due to anticipation under 35 U.S.C. § 102, obviousness under 35

U.S.C. § 103, or both.  Target's IPR petitions rely on five different prior art patents and printed

publications.  All five prior art references pre-date the May 31, 2006 bar date of the Patents-in-

Suit.  Four of them, and portions of the fifth, were not submitted to the PTO during prosecution

of the applications underlying the Patents-in-Suit.  Moreover, as discussed below, the portion of

the sole reference of the five that was previously submitted to the PTO was of too poor a quality

to be meaningfully considered.

        Of the five references submitted with Target's IPR petitions, three anticipate multiple

claims of the Patents-in-Suit.  In total, Target has presented the PTO with more than 25 different

grounds for invalidating the asserted claims.  Examples of the cited prior art are briefly discussed

below, although far more detailed analyses appear in Target's IPR petitions.

        1.      **J.C. Penney's Fall/Winter 2005 Maternity Catalog**

        In late 2005, retailer J.C. Penney published its Fall/Winter 2005 Maternity Collection

catalog (the "JCP Catalog").  *Id.* Ex. 14.  The JCP Catalog discloses a pair of full panel maternity

jeans with a "fold-over panel" providing "over-the-belly coverage" that allows the wearer "to

wear them before, during and after [her] pregnancy."  *Id.* at 15.  Figure 1 from the Patents-in-Suit

is shown below (left), side-by-side with figure 1 from page 15 of the JCP Catalog (right):




1. over-the-belly coverage

*Id.* Ex. 2, fig. 1, Ex. 14, at 15.  As shown above, just as in the Patents-in-Suit, the JCP Catalog

discloses maternity garments having an upper portion including a full panel expansible to cover

and fit over the abdomen of a pregnant woman just beneath the wearer's breast area.  *Id.*  And as

described in the JCP Catalog, and shown above, the "fold-over panel" jeans also have a lower

front portion that recedes downward to make way for the expansion of the panel during different

stages of pregnancy.  *Id.*

Although pages from certain J.C. Penney catalogs, including the JCP Catalog discussed

above, were submitted to the PTO during prior reissue proceedings involving the Patents-in-Suit,

the quality of the grainy and faded black-and-white images and associated text was so extremely

poor and illegible that the submitted pages simply did not show the normally color images of the

depicted products with suffcient clarity or sharpness to reveal their true relevance to the claims

of the Patents-in-Suit.  *See id.* Ex. 22, at 1055-65, Ex. 23, at 1161-71.  In contrast, Target

submitted with its IPR petitions high-resolution, color versions of the pertinent pages from the

JCP Catalog.  Accordingly, the IPR proceedings will be the PTO's first opportunity to meaningfully review DMC's patent claims in light of a legible, intelligible presentation of the JCP Catalog.

      2.       **U.S. Patent Application Publication No. 2004/0049834 ("Stangle")**

Just like the Patents-in-Suit, Stangle discloses a waist-worn "sleeve" garment with a flexible portion that "expand[s] to fit the wearer's body as it changes during the course of pregnancy." *Id.* Ex. 15, ¶ [0033].  The sleeve "provid[es] uniform, gentle support and shape" to the wearer's "belly area." *Id.* ¶ [0032].  "The sleeve 10 is composed of elastic material and has an elasticity and a width that adheres to a wearer's natural body shape without constraint." *Id.* ¶ [0029].  The Stangle sleeve is a full panel that can be "woven integrally with the article of clothing," just as in the Patents-in-Suit. *Id.* ¶¶ [0037]-[0041].  Indeed, Stangle discloses that the sleeve may be incorporated into garments such as skirts, shorts, and pants. *Id.*  Further, "in an unstretched condition and laying [sic] flat," the sleeve has "a length of nine inches (9") to fifteen inches (15") and, in an unstretched condition and laying [sic] flat, a width of four inches (4") to ten inches (10")." *Id.* ¶ [0032].

Figures 6 and 8 from Stangle appear below, with red circles added to highlight the sleeve portion (10 and 40) of the garment. *Id.* figs. 6, 8.  It is important to note that "[t]he movable sleeve 40, as shown in FIG. 8, has an *affixed* end 42 and a *movable* end 44." *Id.* ¶ [0041] (emphases added).  "The affixed end 42 of the sleeve 40 [is] attached to the inside surface 34 of the clothing 32 . . . ." *Id.*  Thus, "as the wearer finds necessary for fastening undersize clothing or providing additional coverage or support, the wearer would instantly deploy the movable sleeve 40 by simply folding it out and over the outside surface . . . of the clothing 32" by pulling the moveable end (44) up and over the affixed end (42). *Id.* ¶¶ [0040]-[0042].

dms.us.52696077.01



Although DMC knew of Stangle during prosecution of the Patents-in-Suit, DMC, remarkably, failed to disclose it to the PTO.[8]  Accordingly, the IPR proceedings will be the PTO's first opportunity to review DMC's patent claims in light of Stangle.

---

[8]   DMC's failure to disclose Stangle to the PTO is remarkable in view of DMC's history with Stangle and its two named inventors, Mr. Gregory L. Stangle and Ms. Elizabeth S. Rodriguez.  In February 2007, Ingrid Carney and Ingrid & Isabel, Inc. (collectively, "Carney") sued DMC (then known as Mothers Work, Inc.) for infringing Carney's U.S. Patent No. 7,181,775 (the "'775 Patent") by selling an unlicensed "Tummy Sleeve" product. Cairns Decl. Ex. 25, ¶¶ 9-21.  The '775 Patent is entitled "Maternity Garment," and relates to, essentially, a stand-alone garment that, like the "belly band" portion of the Patents-in-Suit, is meant to be worn over, but not necessarily affixed to, a pregnant wearer's existing pants, jeans, shorts, or skirts worn in an open, unbuttoned and/or unzipped state.  *See id.* Ex. 26, abstract & col. 4:8-27.  During the Carney litigation, DMC relied on Stangle to invalidate the asserted claims of the '775 Patent; DMC listed Stangle first on its list of prior art references in its September 21, 2007 invalidity contentions and contended that Stangle anticipated all but one of the 15 claims of the '775 Patent.  *Id.* Ex. 27, at 2 & Ex. A thereto.  Indeed, DMC apparently felt so strongly about the value of Stangle to its case that it retained its named inventors, Mr. Stangle and Ms. Rodriguez, as paid consultants.  *Id.* Ex. 28.  DMC relied on Mr. Stangle's May 31, 2007 declaration, as well as testimony from Mr. Stangle's September 13, 2007 deposition, to further support its invalidity contentions as to the '775 Patent. *Id.* Ex. 27, at 2-4.  Thus, DMC clearly knew about Stangle when, on May 31, 2007, it filed the original application underlying the Patents-in-Suit, *id.* Ex. 1; when, on May 8, 2008, it filed the continuation application underlying the '276 Patent, *id.* Ex. 3; and when, on June 15, 2011, it filed the reissue applications that resulted in the Patents-in-Suit, *id.* Ex. 2, Ex. 4.

dms.us.52696077.01

### 3. U.S. Patent No. 6,276,175 to Browder ("Browder")

Browder discloses a seamless body-shaping garment with a body control area (35) that extends from beneath the wearer's belly to just below the bust line, *id.* Ex. 16:



*Id.* figs. 3, 4. Just like the Patents-in-Suit, the garments disclosed in Browder can be used to fit over the abdomen of a pregnant woman in such garments as, for example, "a maternity brief." *Id.* fig. 11 & col. 4:50-59. Indeed, Browder discloses that its garment can be a "maternity brief having . . . at least one area of control substantially covering a user's buttocks, hips, and groin areas [that] aids in controlling the stomach area without reducing the ability of the portion . . . covering the stomach area to expand as needed" during pregnancy. *Id.* col. 6:23-29. As shown in Figures 3 and 4, above, Browder discloses a full belly panel (35) whose upper edge "extend[s] over the abdomen and ends below the wearer's breasts," *id.* col. 3:53-58, and a lower edge that recedes downward in front (near element 36 in Figure 3); red circles are added to highlight the panel portion (35).

dms.us.52696077.01

As with the Stangle prior art, the IPR proceedings will be the PTO's first opportunity to review DMC's patent claims in light of Browder.[9]

**D.**     **DMC Has Numerous Competitors in the Market for Full Panel Maternity Pants**

As DMC stated in its 2012 Annual Report, its "business is highly competitive and characterized by low barriers to entry."  *Id.* Ex. 31, at 13, 19.  DMC "face[s] competition in [its] maternity apparel lines from various sources, including department stores, specialty retail chains, discount stores, independent retail stores and catalog and Internet-based retailers, from both new and existing competitors."  *Id.* at 14, 19.  In particular, DMC "currently face[s] competition on a nationwide basis from retailers such as Gap, H&M, Old Navy, Target and Wal-Mart," as well as Babies "R" Us.  *Id.*  Indeed, all of these companies, as well as J.C. Penney, compete with DMC's Secret Fit Belly® products in the market for full panel maternity pants.

**1.**     **DMC Has Threatened Several of Its Competitors in the Past**

DMC has a history of wielding its actual and prospective patent rights to threaten its competitors in the market for full panel maternity pants.  DMC first threatened Gap with its prospective patent rights on July 11, 2008.  *Id.* Ex. 6.  DMC similarly threatened J.C. Penney for

---

[9]     A figure that appears to be Browder's Figure 3 was submitted to the PTO with an Information Disclosure Statement ("IDS") during prior reissue proceedings involving the Patents-in-Suit.  Cairns Decl. Ex. 22, at 1023, 1053-54, Ex. 23, at 1147, 1180-81.  However, oddly, the submitted figure was stripped of all identifying marks and other information indicating that it was taken from Browder or that it was prior art to the Patents-in-Suit.  *See id.*  The figure in question appears on the first page of a two-page document depicting a total of three similarly stripped-down figures, each of which appears to have come from a different source.  The IDS identifies the two-page document in which the figures appear only as "'Images from un-identified documents,' (2 sheets)."  *Id.* Ex. 22, at 1023, Ex. 23, at 1147.  When confirming which of the submitted prior art references she considered, the PTO examiner, Gloria Hale, drew a line through the document's name and noted "NO DATE."  *Id.* Ex. 22, at 1091, Ex. 23, at 1231.  Moreover, at the bottom of the page, examiner Hale further noted "ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH.  /G.H./."  *Id.* Ex. 22, at 1091, Ex. 23, at 1231.  Thus, because the stripped-down figures did not include any dates or other indicia of their respective ages or sources, the PTO expressly declined to consider them when assessing the patentability of the Patents-in-Suit.  *See* 37 C.F.R. § 1.97(i) (2010) ("If an [IDS] does not comply with either this section or § 1.98, it will be placed in the file but will not be considered by the Office."); MPEP § 609 (8th ed., rev. 8, July 2010) (instructing PTO examiners to "strikethrough each citation not considered.  Each page of reference citations will be stamped by the examiner with the phrase 'All references considered except where lined through' along with the examiner's electronic initials . . . .").

the first time on August 31, 2008.  *Id.* Ex. 7.  Over six months after the PTO published the

original applications underlying the Patents-in-Suit, on December 4, 2008, *id.* Ex. 1, Ex. 3, and

nearly a year after threatening Gap and J.C. Penney, DMC first threatened Target with its

prospective patent rights on June 26, 2009, *id.* Ex 5.

DMC apparently felt so strongly about the activities of its competitors that in June 2010 it

asked the PTO to expedite the process of examining its patent applications based, in part, on

DMC's representation that "there are infringing products currently on the market."[10]  *Id.* Ex. 20,

at 750-51, Ex. 21, at 913-14.  Subsequently, 12 of the 16 presently asserted claims of the '531

Patent issued on October 19, 2010, *id.* Ex. 1, and 11 of the 13 presently asserted claims of the

'563 Patent issued on March 8, 2011, *id.* Ex. 3.[11]

Despite its prior threats to competitors and its representations to the PTO, DMC did not

file the present suit against Target until October 4, 2012, *see* Compl., ECF No. 1, nearly *two*

*years* after the first of its patents issued in October 2010, and well over *three years* after first

threatening Target with its prospective patent rights in June 2009.

> **2.**    **Other than Target, DMC Has Never Actually Sued Any of Its Many Other Competitors in the Market for Full Panel Maternity Pants**

Besides Target, DMC has many competitors in the market for full panel maternity pants.

The following are just a few examples:  H&M sells its "MAMA Skinny Jeans," *id.* ¶ 35 & Ex.

---

[10]    In the same request, known as a "Petition to Make Special," DMC additionally represented to the PTO that "the Applicants have a good knowledge of the pertinent prior art," and "[t]he [prior art] references deemed most closely related to the subject matter encompassed by the claims are already on the record."  Cairns Decl. Ex. 20, at 750-51, Ex. 21, at 913-14.  Although the PTO subsequently denied DMC's petitions, *see, e.g.*, *id.* Ex. 20, at 759-60, at least in light of DMC's prior knowledge of Stangle, *see supra* note 8, and DMC's potential prior knowledge of Browder, *see supra* note 9, the accuracy of DMC's representations to the PTO regarding the "most closely related" prior art being "already on the record" is questionable.

[11]    DMC's Disclosure of Asserted Claims and Infringement Contentions ("Infringement Contentions") allege that the Defendants infringe claims 1-2, 5-6, 10-11, 15-18, and 24-29 of the '531 Patent, and claims 1-4, 6-8, 10, 12, 14, 16, and 20-21 of the '563 Patent.  Cairns Decl. Ex. 29, at 2.  Only asserted claims 26-29 of the '531 Patent issued after October 19, 2010, *id.* Ex. 2, and only asserted claims 20 and 21 of the '563 Patent issued after March 8, 2011, *id.* Ex. 4.

32; Babies "R" Us sells its "Petite Thyme Maternity Boot-Cut Jean with 3 in 1 Panel," *id.* ¶ 36 &

Ex. 33; Walmart sells its "Oh! Momma Maternity Full-Panel Embellished Straight-Leg Jeans,"

*id.* ¶ 37 & Ex. 34; and Old Navy sells its "Maternity Smooth-Panel Jeans," *id.* ¶ 38 & Ex. 35.

Moreover, despite DMC's prior threats, even J.C. Penney and Gap continue to sell

competing products.  For example, J.C. Penney sells its "Tala Maternity Heavy-Stitch Overbelly

Bootcut Jeans," *id.* ¶ 39 & Ex. 36, and Gap sells its "1969 full panel black legging jeans," *id.* ¶

40 & Ex. 37.  Nonetheless, aside from Target, DMC has never sued *any* of its other competitors

on the Patents-in-Suit, including J.C. Penney and Gap—despite first threatening them *five* years

ago.

## III.  <u>ARGUMENT</u>

In view of the reasons discussed above and the detailed analyses provided in Target's IPR

petitions, the Patents-in-Suit do not claim anything novel or non-obvious over the well-

established prior art.[12]  Once the PTO confirms the invalidity of the Patents-in-Suit, DMC's

cause of action will be extinguished.  *Fresenius USA, Inc. v. Baxter Int'l, Inc.*, Nos. 2012-1334,

2012-1335, 2013 WL 3305736, at *8 & n.7 (Fed. Cir. July 2, 2013).

Continuing this case in the face of parallel PTO proceedings will waste judicial resources.

*See Visual Interactive Phone Concepts, Inc. v. Samsung Telecommc'ns Am., LLC*, 11-12945,

2012 WL 1049197, at *4 (E.D. Mich. Mar. 28, 2012) ("It is an indisputable waste of judicial

resources to hold a *Markman* hearing, rule on discovery and dispositive motions, and conduct a

trial, all at great expense to the parties, when the PTO's decision could render these proceedings

moot or substantially alter the claims being litigated."); *see also Bechtel Corp. v. Laborer's Int'l*

---

[12]   In view of the PTO's IPR procedure having become available only relatively recently (September 16, 2012), *see* 35 U.S.C. § 311 (note); 77 Fed. Reg. 48,680, and given the substantial similarity between the underlying intent and potential results of IPR proceedings and the underlying intent and potential results of *ex parte* and *inter partes* reexamination proceedings before the PTO, *see id.*, Target occasionally cites herein law or other information pertaining to *ex parte* and/or *inter partes* reexamination proceedings.

-18-

*Union*, 544 F.2d 1207, 1215 (3d Cir. 1976) (stay appropriate where arbitrator ruling in another related matter might obviate the pursuit of the plaintiff's action in federal court).  The better course is staying the case now and allowing the PTO to evaluate the validity of the Patents-in-Suit to prevent needless expenditure of resources by the Court and the parties.

A.  <u>Law Governing Stays Pending the Outcome of PTO Proceedings</u>

A decision to stay a patent case pending the conclusion of a PTO administrative proceeding lies within the sound discretion of the Court.  *Viskase Corp. v. Am. Nat'l Can Co.*, 261 F.3d 1316, 1328 (Fed. Cir. 2001); *see also Ethicon, Inc. v. Quiqq*, 849 F.2d 1422, 1426-27 (Fed. Cir. 1988).  Indeed, "'the power to stay proceedings is incidental to the power inherent in every court to control the disposition of the cases on its docket with economy of time and effort for itself, for counsel, and for litigants.'"  *Cheyney State Coll. Faculty v. Hufstedler*, 703 F.2d 732, 737 (3d Cir. 1983) (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 254-55 (1936)).

"There is a liberal policy in favor of granting motions to stay proceedings pending the outcome of the PTO reexamination or reissuance proceedings, especially in cases that are still in the initial stages of litigation and where there has been little or no discovery." *Pragmatus Telecom, LLC v. NETGEAR, Inc.*, No. C 12-6198 SBA, 2013 WL 2051636, at *2 (N.D. Cal. May 14, 2013); *ASCII Corp. v. STD Entm't USA, Inc.*, 844 F. Supp. 1378, 1381 (N.D. Cal. 1994) (same); *see also Air Vent, Inc. v. Owens Corning Corp.*, No. 2:10-cv-01699, 2012 WL 1607145, at *2 (W.D. Pa. May 8, 2012); *Cross Atl. Capital Partners, Inc. v. Facebook, Inc.*, No. 07-2768, 2010 WL 4751673, at *1 (E.D. Pa. Nov. 22, 2010) (both quoting *ASCII Corp.*).

"[A] court may decide to grant a motion to stay 'in order to avoid inconsistent results, narrow the issues, obtain guidance from the PTO, or simply to avoid the needless waste of judicial resources, especially if the evidence suggests that the patents-in-suit will not survive

reexamination.'" *Air Vent*, 2012 WL 1607145, at *2 (quoting *MercExchange, L.L.C. v. eBay, Inc.*, 500 F. Supp. 2d 556, 563 (E.D. Va. 2007)).  Indeed, "granting a stay is favored and appropriate when the reexamination result might assist the court in making a validity determination or would eliminate the need to make an infringement determination." *Cross Atl. Capital Partners*, 2010 WL 4751673, at *1.

In deciding whether to stay a case, courts frequently consider the following three factors: "(1) whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party; (2) whether a stay will simplify the issues in question and trial of the case; and (3) whether discovery is complete and whether a trial date has been set." *Innovative Office Prods., Inc. v. Spaceco, Inc.*, No. 05-4037, 2008 WL 4083012, at *2 (E.D. Pa. Aug. 28, 2008); *Heraeus Electro-Nite Co., LLC v. Vesuvius USA Corp.*, No. 09-2417, 2010 WL 181375, at *1 (E.D. Pa. Jan. 11, 2010).  However, the "court's inquiry is not limited to these three factors—the totality of the circumstances governs." *Universal Elecs., Inc. v. Universal Remote Control, Inc.*, No. 12-00329, 2013 WL 1876459, at *2 (C.D. Cal. May 2, 2013).

**B.**      **<u>All Factors and the Totality of the Circumstances Favor Granting a Stay</u>**

An IPR proceeding is the proper mechanism for determining patent validity here.  In its IPR petitions, Target provided the PTO with multiple grounds for which each and every claim of the Patents-in-Suit is unpatentable as a result of prior art.  This is especially remarkable considering some of that prior art—at least Stangle and possibly Browder—likely was in DMC's hands during prosecution of its applications but was never submitted to the PTO.[13]  This Court and the parties "will benefit from the PTO's evaluation of how the previously unconsidered prior art references impact the claims of the patent-in-suit." *Sorensen v. Black & Decker Corp*., No. 6-

---

[13]   *See supra* notes 8, 9 and accompanying text.

1572-BTM, 2007 U.S. Dist. LEXIS 66712, at *5 (S.D. Cal. Sept. 10, 2007); *see also Old Reliable Wholesale*, 635 F.3d at 548 (noting the PTO's "acknowledged expertise in evaluating prior art and assessing patent validity").

### 1. Granting a Stay Will Not Cause Undue Prejudice or Create a Clear Tactical Disadvantage for DMC

The first factor—"whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party," *Innovative Office Prods.*, 2008 WL 4083012, at *2— weighs heavily in favor of a stay for several reasons:  (a) the delay caused by the IPR proceeding, by itself, does not constitute undue prejudice; (b) DMC delayed filing suit for nearly two years; (c) Target is a competitor, yet DMC did not seek preliminary injunctive relief here; (d) there are several other competitors in the market for full panel maternity pants who DMC has never sued; and (e) the Patents-in-Suit will not naturally expire until 2027—14 years away.

### a. DMC Will Not Suffer Undue Prejudice

The delay caused by an IPR proceeding does not, by itself, establish undue prejudice. *See Enhanced Sec. Research, LLC v. Cisco Sys., Inc.*, No. 09-571-JJF, 2010 WL 2573925, at *3 (D. Del. June 25, 2010); *Wall Corp. v. BondDesk Grp., LLC*, No. 07-844-GMS, 2009 WL 528564, at *2 (D. Del. Feb. 24, 2009).  Moreover, IPR proceedings are required to conclude within 18 months or sooner, *see supra* Part II.A, thereby eliminating any undue prejudice that DMC might otherwise suffer in the case of a potentially unbounded stay.

DMC delayed for nearly two years before filing this lawsuit.  Indeed, although DMC first began threatening Target with its prospective patent rights in June 2009, Cairns Decl. Ex. 5, and told the PTO of "infringing products currently on the market" in June 2010, *id.* Ex. 20, at 750-51, Ex. 21, at 913-14, twelve of the presently asserted claims issued as early as October 19, 2010.[14]

---

[14]    *See supra* note 11 and accompanying text.

In view of its prior accusations against Target and representations to the PTO, DMC apparently could have chosen to sue Target at any time on or after October 19, 2010.  But DMC chose not to do so and, instead, delayed nearly two years until it filed this suit on October 4, 2012.  *See* Compl., ECF No. 1.  DMC's delay in filing suit belies any undue prejudice DMC may allege in opposing a stay.

Moreover, it is significant that when DMC ultimately did file its lawsuit, it did not seek a preliminary injunction.  This indicates that DMC did not feel it would be unduly prejudiced—or irreparably harmed—by Target's continued sale of the accused products during the course of the litigation.[15]  *See, e.g.*, *Hill-Rom Servs., Inc. v. Stryker Corp.*, No. 1:11-cv-01120-JMS-DKL, 2012 WL 5878087, at *2 (S.D. Ind. Nov. 20. 2012) ("[A]ttempts by a patentee to argue undue prejudice are undermined if it has elected not to pursue a preliminary injunction."); *see also EI Du Pont De Nemours & Co. v. MacDermid Printing Solutions LLC*, No. 10-3409 (MLC), 2012 WL 2995182, at *5 (D.N.J. July 23, 2012) ("While the Court appreciates [the patentee's] concern that [the alleged infringer] will continue to sell its allegedly infringing product during the course of the stay, thereby further eroding [the patentee's] market share and resulting in substantial loss of profits and goodwill, the Court notes that [the patentee] did not seek a preliminary injunction in this matter."); *Studer Prof'l Audio GmbH v. Calrec Audio Ltd.*, No. 2:12-cv-02278 (WHW), 2012 WL 3061495, at *2 (D.N.J. July 25 2012) (imposing a stay after concluding that the patentee had not shown undue prejudice because it did not seek a preliminary injunction and would "still have all of [its] legal and equitable remedies available when the stay

---

[15]   Notably, the Federal Circuit has held that "[a] preliminary injunction should not be granted if there is a substantial issue of patent validity."  *Procter & Gamble Co. v. Kraft Foods Global, Inc.*, 549 F.3d 842, 849 (Fed. Cir. 2008); *Amazon.com v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350-51 (Fed. Cir. 2001); *Genentech, Inc. v. Novo Nordisk, A/S*, 108 F.3d 1361, 1364 (Fed. Cir. 1997).  Thus, in view of the prior art discussed in Target's IPR petitions and above, *see supra* Part II.C, any attempt by DMC to seek a preliminary injunction here likely would not have succeeded.

is lifted"); *Ever Win Int'l Corp. v. Radioshack Corp.*, 902 F. Supp. 2d 503, 511 (D. Del. 2012) ("Plaintiff never sought a preliminary injunction, which suggests that any prejudice to Plaintiff that might result from delaying the ultimate resolution of this dispute is not as severe as it contends."). DMC cannot now credibly claim that it would be unduly prejudiced by a stay when DMC's prior failure to seek preliminary injunctive relief indicates that DMC, itself, saw little or no undue prejudice when it initiated this case.

DMC also will not be unduly prejudiced by a loss of market value or market share during the stay. There are numerous other competitors in the market for full panel maternity pants, including, for example, H&M, Babies "R" Us, Walmart, Old Navy, Gap, and J.C. Penney. Cairns Decl. ¶¶ 35-40 & Exs. 32-37. Moreover, DMC has previously threatened—but has never sued—at least two of those competitors, J.C. Penney and Gap. *Id.* Ex. 6, Ex. 7. The presence of other competitors in the market for the accused products undermines any attempt by DMC to argue that it will be unduly prejudiced by a stay. *Air Vent*, 2012 WL 1607145, at *3 ("The Court finds that the fact that there are other competitors in the market undermines [Plaintiff]'s assertion of undue prejudice because of loss of market value."). This is especially true here, where DMC (a) first threatened other competitors in mid-2008, Cairns Decl. Ex. 6, Ex. 7, but has yet to take any action against them as of August 2013—*five years later*, and (b) did not seek a preliminary injunction, *see Du Pont*, 2012 WL 2995182, at *5; *see also Neste Oil Oyj v. Dynamic Fuels, LLC*, No. 12-662-GMS, 2013 WL 424754, at *3 (D. Del. Jan. 31, 2013) ("Here, Neste Oil [the patentee] has not sought a preliminary injunction. Given this failure and the large number of firms in the biomass-based diesel fuel market, the court is not wholly convinced that Neste Oil and the defendants are such 'direct competitors' that granting a stay in this matter would cause Neste Oil undue prejudice.").

dms.us.52696077.01

Finally, 14 years remain before the Patents-in-Suit naturally expire.[16]  The Patents-in-Suit

will naturally expire on the date that is 20 years from their earliest priority date, *see* 35 U.S.C. §

154(a)(2), plus any term adjustment allowed by the PTO, *id.* § 154(b).  The terms of the Patents-

in-Suit are coterminous, *see* 37 C.F.R. § 1.321(c)(3), because they are subject to mutual terminal

disclaimers, Cairns Decl. Ex. 22, at 1092-93, 1113, Ex. 23, at 1252-53, 1258.  The Patents-in-

Suit have a common priority date of May 31, 2007 and are subject to a term extension of 87

days.  Cairns Decl. Exs. 3, 4.  As such, neither of the Patents-in-Suit will naturally expire until

August 26, 2027 (20 years from May 31, 2007 is May 31, 2027, plus 87 days is August 26,

2027).  Thus, to the extent the Patents-in-Suit survive the IPR proceedings, DMC likely will have

well over a decade to pursue actions based on the Patents-in-Suit even after any stay in this case

is lifted.

### b.      *DMC Will Not Suffer a Clear Tactical Disadvantage*

For all the reasons above showing that DMC will not suffer undue prejudice, DMC also

will not suffer a clear tactical disadvantage if a stay is imposed here.  There is no dilatory motive

behind Target's filing of its IPR petitions that would place DMC at a clear tactical disadvantage

in this or any other litigation.  Indeed, the present Motion was filed less than 24 hours after

Target's IPR petitions.  *See id.* Exs. 10-13, 18.  Moreover, DMC has not initiated any other

litigation involving the Patents-in-Suit, so staying this case will not impose a clear tactical

disadvantage on DMC with respect to any other related litigation.

On the contrary, the IPR proceedings will bring clarity to the highly questionable validity

of the Patents-in-Suit.  Although the PTO has yet to formally grant Target's IPR petitions, "[i]t is

---

[16]  A U.S. patent "naturally expires" when its statutory term under 35 U.S.C. § 154 runs and ends without any intervening events—such as an invalidly finding as to one or more claims—that impact the statutory term.  *See, e.g.*, *Siemens Healthcare Diagnostics, Inc. v. Enzo Life Sci., Inc.*, No. 10-40124-FDS, 2013 WL 4411227, at *9 (D. Mass. Aug. 14, 2013) (noting that the patent-at-issue would "naturally expire[] upon conclusion of its [statutory] term").

not uncommon for courts to grant stays pending reexamination prior to the PTO deciding to

reexamine the patent." *Air Vent*, 2012 WL 1607145, at *3; *see also Ralph Gonnocci Revocable*

*Living Trust v. Three M Tool & Mach., Inc.*, No. 02-74796, 2003 WL 22870902, at *4 n.6 (E.D.

Mich. Oct. 7, 2003) ("The Court finds that a stay at least is warranted while the PTO makes its

initial determination as to whether to proceed with a reexamination."). Here, the parties will

have an initial decision from the PTO by around February 2014. *See* 35 U.S.C. §§ 313, 314(a);

37 C.F.R. § 42.107(b); *see also supra* Part II.A.  It makes little sense to continue to expend

judicial and party resources in the interim.

      Given that fact discovery has yet to close, no expert discovery has occurred, no

depositions have been taken, no dispositive motions or *Markman* briefs have been filed, and a

trial date has yet to be set, *see* Sched. Ord., at 1-2, ECF No. 33, the status of the case favors a

stay, *see Pragmatus*, 2013 WL 2051636, at *2; *Biogaia AB v. Nature's Way Prods, Inc.*, No.

5:10-cv-449-FL, 2011 WL 3664350, at *2 (E.D.N.C. Aug. 18, 2011).  Absent a stay, significant

resources will be devoted to addressing the validity issue before this Court as this litigation

proceeds, including through further fact and expert discovery, dispositive motions, and, if need

be, trial.  Thus, far short of creating a clear tactical disadvantage for DMC, imposing a stay

during the IPR proceedings will allow DMC, as well as this Court and the Defendants, to

conserve resources until such time as the PTO decides the validity of the Patents-in-Suit.

      **2.**      **Granting a Stay Will Simplify the Issues in Question and the Case for Trial**

      The second factor—whether a stay will simplify the issues in the case and for trial,

*Innovative Office Prods.*, 2008 WL 4083012, at *2—also weighs in favor of a stay.   As the

Federal Circuit has stated, "in a stayed infringement proceeding, 'if the [patentee's] claims were

canceled in the reexamination, [it] would eliminate the need to try the infringement issue.'"

*Fresenius*, 2013 WL 3305736, at *8 (quoting *Slip Track Sys., Inc. v. Metal Lite, Inc.*, 159 F.3d 1337, 1342 (Fed. Cir. 1998)); *Gould v. Control Laser Corp.*, 705 F.2d 1340, 1342 (Fed. Cir. 1983); *see also Cross Atl. Capital Partners*, 2008 WL 3889539, at *1 ("One purpose of the reexamination procedure is to eliminate trial of that issue [i.e., infringement] (when the claim is canceled) or to facilitate trial of that issue by providing the district court with the expert view of the USPTO (when a claim survives the reexamination proceeding)."); *Ethicon*, 849 F.2d at 1426 (noting that the legislative history for the reexamination statute "says that reexamination 'will permit efficient resolution of questions about the validity of issued patents *without recourse to expensive and lengthy infringement litigation*'" (emphasis added)).  Indeed, staying a case pending PTO proceedings can streamline the litigation in a number of important ways:

> (1) all prior art presented to the court at trial will have been first considered by the PTO with its particular expertise, (2) many discovery problems relating to the prior art can be alleviated, (3) if [the subject] patent[s] [are] declared invalid, the suit will likely be dismissed, (4) the outcome of the reexamination may encourage a settlement without further involvement of the court, (5) the record of the reexamination would probably be entered at trial, reducing the complexity and the length of the litigation, (6) issues, defenses, and evidence will be more easily limited in pretrial conferences and (7) the cost will likely be reduced both for the parties and the court.

*Gioello Enters. Ltd. v. Mattel, Inc.*, No. 99-375-GMS, 2001 WL 125340, at *1 (D. Del. Jan. 29, 2001).

In addition to reducing or eliminating the need to engage in fact and expert discovery, dispositive motion practice, and trial on both infringement *and* invalidity issues, the IPR proceedings before the PTO will simplify or eliminate issues related to damages.  To the extent any asserted claims of the Patents-in-Suit survive the IPR proceedings, statistics show that they will almost certainly differ in scope.  For example, of all reexaminations that resulted in the PTO issuing reexamination certificates under the prior *Inter Partes* reexamination procedure, 82%

resulted in modification or cancellation of the reexamined claims.[17]  Cairns Decl. Ex. 30.  DMC

will be precluded from seeking past damages on any canceled or substantively amended claims,

*see Fresenius*, 2013 WL 3305736, at *6-8; *Laitram Corp. v. NEC Corp.*, 163 F.3d 1342, 1346

(Fed. Cir. 1998); *see also* 35 U.S.C. §§ 252, 318(c), thereby simplifying the issues related to

remedies, if any.  Accordingly, imposing a stay will conserve judicial and party resources that

otherwise will be needlessly expended resolving issues that the IPR proceedings are designed to

reduce, simplify, and/or eliminate.

### 3.      Discovery Is Incomplete and No Trial Date Has Been Set

The third factor—"whether discovery is complete and whether a trial date has been set,"

*Innovative Office Prods.*, 2008 WL 4083012, at *2—also weighs heavily in favor of a stay.  As

discussed above, discovery in this case is far from complete.  Indeed, only limited fact and third-

party discovery has occurred, no depositions have been taken, no expert reports have been

served, and no dispositive motions or *Markman* briefs have been filed.  Fact discovery in this

matter remains open, and expert discovery is not set to close until December 13, 2013.  Sched.

Ord., at 1, ECF No. 33.  The early posture of this litigation heavily favors a stay.  *Pragmatus*,

2013 WL 2051636, at *2; *Biogaia*, 2011 WL 3664350, at *2 ("In the present case, the factors

weigh heavily in favor of staying the proceedings.  First, as defendant points out, this case is in

an early stage of litigation.").

Moreover, no trial date has been set in this case.  Rather, the Court ordered that "the

parties will be given notice of a Final Pre-Trial Conference" "[a]fter all dispositive motions have

been decided or the time for filing dispositive motions has elapsed."  Sched. Ord., at 2.  The

dispositive motion deadline is not until January 29, 2014, *id.* at 1, which is just weeks before

---

[17]     Such statistics are not yet available for IPR proceedings.  *See supra* note 12 and accompanying text.

Target expects the PTO to decide whether it will grant Target's IPR petitions in around February 2014, *see* 35 U.S.C. §§ 313, 314(a); 37 C.F.R. § 42.107(b); *see also supra* Part II.A.  Given that Target will seek summary judgment at least as to the invalidity of the Patents-in-Suit (e.g., if the present Motion is not granted), the final pre-trial conference—and, presumably, a trial date— likely will not be set in this case until many weeks or months after the January 29, 2014 dispositive motion deadline.  Therefore, it would make the most sense to stay this case pending the outcome of the IPR proceedings, as in all likelihood the Court and the parties will know whether the PTO has decided to grant Target's petitions *before* both (a) this Court is able to decide Target's motion(s) for summary judgment of invalidity, and (b) a trial date is set in this case.  Accordingly, this factor favors imposing a stay at this time.

> **4.**     **The Totality of the Circumstances Favors Granting a Stay**

All of the factors above weigh in favor of imposing a stay.  In light of those factors, the effect that any PTO decision on the validity of the Patents-in-Suit will have on this and any other district court litigation or appeal involving the Patents-in-Suit, *see Fresenius*, 2013 WL 3305736, at *8 & n.7, and fundamental considerations of fairness, the totality of the circumstances favors granting a stay.

In *Fresenius*, the Federal Circuit recently answered in the affirmative the question of "whether, under the reexamination statute, the cancelation of claims by the PTO is binding in pending district court infringement litigation."  *Id.* at *5, *8.  Specifically, the Court held that "if the PTO confirms the original claim in identical form, a suit based on that claim may continue, but if the original claim is cancelled or amended to cure invalidity, the patentee's cause of action is extinguished and the suit fails."  *Id.* at *8 & n.7; *see also id.* at *9 ("Baxter wisely agrees that in general, when a claim is cancelled, the patentee loses any cause of action based on that claim,

and any pending litigation in which the claims are asserted becomes moot.").  This rule holds true right up until a final adjudication on the merits of a parallel civil litigation and can trump an intervening finding of validity by this Court or even the Federal Circuit.  *Id.* at *8-*10.  That is, any intervening decision from the PTO regarding the validity of the Patents-in-Suit will apply to this litigation *even if* there is an interim judicial decision on validity.  *Id.* at *10.  Thus, the PTO's determination of invalidity will be dispositive.

Given the highly questionable validity of the Patents-in-Suit, it would be fundamentally unfair to force Target (and its co-defendants) to continue expending significant resources defending against DMC's claims and engaging in further discovery in this case until such time as the validity of those claims is clarified.  Indeed, needlessly litigating in parallel to an IPR proceeding wastes judicial and party resources where, as here, the asserted claims of the Patents-in-Suit are highly likely to be invalidated, amended, and/or narrowed by the PTO.  As such, and in further view of the PTO's "acknowledged expertise" on the subject, *Old Reliable Wholesale*, 635 F.3d at 548, the totality of the circumstances makes clear that this case should be stayed to allow the PTO to decide the invalidity of the Patents-in-Suit.

## IV.    CONCLUSION

All of the pertinent factors and the totality of the circumstances weigh in favor of staying this case.  For this and all of the foregoing reasons, Target respectfully requests that this Court grant the present Motion and stay this litigation pending the conclusion of Target's IPR proceedings.  Any stay granted by the Court will remain in effect only if the PTO decides to grant one or more of Target's IPR petitions.

-29-

V.       **REQUEST FOR HEARING AND/OR ORAL ARGUMENT**

Target respectfully requests that the Court hold a hearing and/or oral argument if the present Motion is opposed and if it will assist the Court in deciding the issues presented.

dms.us.52696077.01

Dated:  August 28, 2013                    Respectfully submitted,

                                           /s/ *Daniel M. Lechleiter*
                                           Francis J. Grey, Jr.
                                                Pennsylvania I.D. No. 56145
                                           Sean L. Corgan
                                                Pennsylvania I.D. No. 306947
                                           **LAVIN, O'NEIL, RICCI,**
                                           **CEDRONE & DISIPIO**
                                           190 North Independence Mall West
                                           6th and Race Streets, Suite 500
                                           Philadelphia, Pennsylvania  19106
                                           Telephone:  (215) 627-0303
                                           Facsimile:  (215) 627-2551
                                           E-mail: fgrey@lavin-law.com
                                                     scorgan@lavin-law.com

                                           R. Trevor Carter (*pro hac vice*)
                                                Indiana Bar No. 18562-49
                                           Daniel M. Lechleiter (*pro hac vice*)
                                                Indiana Bar No. 25675-49
                                           **FAEGRE BAKER DANIELS LLP**
                                           300 North Meridian Street, Suite 2700
                                           Indianapolis, Indiana  46204-1750
                                           Telephone:  (317) 237-0300
                                           Facsimile:  (317) 237-1000
                                           E-mail: trevor.carter@faegrebd.com
                                                     daniel.lechleiter@faegrebd.com

                                           Andrew F. Johnson (*pro hac vice*)
                                                Minnesota Bar No. 389331
                                           **FAEGRE BAKER DANIELS LLP**
                                           2200 Wells Fargo Center
                                           90 South Seventh Street
                                           Minneapolis, Minnesota  55402-3901
                                           Telephone:  (612) 766-7000
                                           Facsimile:  (612) 766-1600
                                           E-mail: andrew.johnson@faegrebd.com

                                           ***Counsel for Defendant Target Corporation***

-31-

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on August 28, 2013, a true and correct copy of the foregoing document was served on all counsel of record registered with the Court's CM/ECF system by filing said document via the Court's CM/ECF system.

*/s/ Daniel M. Lechleiter*

dms.us.52696077.01